Let's go. Good morning, Your Honors. May it please the Court. My name is Travis Hexner, and with me at council table are fellow student Dustin Buehler and supervising attorneys Leonard Feldman and Eric Schnapper. Now, because we are students representing Ms. Jones-Heim, we've decided to split our argument, such that I will do the opening argument, and we would like to reserve three minutes for rebuttal, which Mr. Buehler will handle. Now, the principled issue in this case, Your Honors, is whether prison officials came forward with some evidence addressing the specific factual question framed by Ms. Jones-Heim exculpatory evidence that her test was a false positive. Now, as everyone agrees, the constitutional standard governing this case is some evidence. And on this issue, Ms. Jones-Heim presented a letter from the manufacturer of Midran stating that false positives for amphetamines were, quote, such a common occurrence, we keep the standard letter in the computer, close quote. But can I – you have sued seven people, right? Yes, Your Honor. And don't we have to apply – it actually may be more than seven, but don't we have to apply the question first, what did they do that was in violation of the Constitution, and then in doing that, would they have known that their acts were unlawful, in other words, qualified immunity? So don't we have to look at each one separately and say, okay, well, what did they do, and how did that violate the Constitution? If you had the hearing officer, you say the hearing officer, you could say knowingly violated the Constitution by not having enough evidence and finding her guilty. But how about, like, take Mr. Selle. What did Mr. Selle do? Your Honor, Mr. Selle was, I believe, a prison officer who had supervisory authority over her discipline, and she was subjected to isolated imprisonment after this as an act of retaliation. But most importantly – Was he the physician's assistant? Oh, yes, Your Honor. He was the assistant to Dr. Thompson. Okay. So what did he do that he would have known would be in violation of the Constitution? Your Honor, Ms. Jonsheim submits that Mr. Selle would have known, or should have known, rather, the potential side effects of Midran and negligently prescribed it to her. Well, what evidence – this is on summary judgment. This isn't just on motion to dismiss. So what evidence do you have that he knew of the side effects of Midran? Your Honor, Ms. Jonsheim alleges that he knew these side effects in her response to the motion for summary judgment. But don't you have to have proof? Does she have enough proof that would merit a trial? In other words, is a trial going to be a waste of time? Your Honor, as you noted, this is reviewing the record on a motion for summary judgment. And under that, we review the record in the light most favorable to Ms. Jonsheim. But you have to look at the evidence. There would have to be some declarations, depositions, and derogatory answers exhibited, something to show that a trial wouldn't be a waste of time, that she could – a reasonable jury could possibly, taking everything in the light most favorable to her, prevail, let her prevail. And so what is it – I just don't understand what evidence you have on each of these people. Mr. Selle, I think, would be the first person I'm asking about. Your Honor, Ms. Jonsheim did not submit a declaration to this point. But she is a pro se plaintiff, and this Court does construe the pleadings on behalf of pro se plaintiffs liberally. On a motion to dismiss. On a motion to dismiss and also the affidavits and declarations, et cetera. But the pro se plaintiffs still have to comply with Rule 56. Yes, Your Honor. We would submit that by her signing this response to the motion for summary judgment, that that is a corollary to actually submitting a declaration. Well, say the case went to trial. Who are you going to call? If we reverse, who are you going to call as a witness as to Mr. Selle? Gave the pills to her, right? So now who's your witness that he knew that it's going to result in a false positive? Your Honor, that's an issue we have not yet reached, which witnesses would be called at trial at this point. I would submit that we would call Ms. Jonsheim. Okay. And Ms. Jonsheim is going to testify that Mr. Selle knew that this was going to cause a false positive? I believe so, Your Honor. We have not asked this question of Ms. Jonsheim at this point. Well, but you're asking us to reverse summary judgment and send it back for trial, right? Yes, Your Honor. But I don't see what you have against Mr. Selle. Your Honor, beyond just Mr. Selle, Ms. Jonsheim has at least named three proper defendants. She has named former warden Reese, current warden Schultz, and associate former warden Gutierrez, and has alleged they personally decided her case by denying her appeal. Well, what did Schultz do? He's the current warden, right? Yes, Your Honor. So what did Schultz do? Once again, Ms. Jonsheim has alleged that her appeal went directly to the current warden and that he decided her case by denying that appeal. Well, but who was the warden who actually decided her case? Was it Reese or was it Schultz? Your Honor, it's unclear at this point. I believe that is why Ms. Jonsheim has named both wardens, because she was not familiar with the disciplinary process and the transition that took place. Well, who was the warden when they reviewed her disciplinary? I mean, that should be an objective fact. Yes, Your Honor. I believe Ms. Jonsheim is not aware of who was the warden at the exact time that her appeal was denied. And the district court noted further on footnote 11 of its opinion that Ms. Jonsheim had, in fact, named the proper defendants because they did have final authority over her case. Now, returning to the issue of the sum evidence in this case, Your Honors, once again, Ms. Jonsheim has presented a letter from the manufacturer of Midran stating that false positives for amphetamines were a frequent occurrence. Now, by way of response, the DHO contacted National Toxicology Laboratory, which merely stated that it was, quote, not aware of amphetamines, excuse me, of Midran causing a false positive for amphetamines. In other words, the government responded with a resounding, I don't know. I guess the question that I had was, why wasn't the evidence that was presented some evidence? You had an EMET test and then a GCMS test, which our court has said is 99.9% reliable. And then you have a letter that said there's a possibility of false positives, but doesn't say which test would cause a possibility of false positives. And then the prison officials followed up and called up the labs and said, no, you know, that we've never heard about Midran. You know, that's one interpretation to put on it. Now, at a trial, I can see there might be you have relevant evidence on both sides, but all this Court needs to uphold the prison's decision is some evidence. And I'm having trouble understanding why we don't have some evidence here. Your Honor, the reason there's no evidence in this case is because of a critical distinction between general reliability and specific reliability. As in Meese and McBride, a case that we have cited, Ms. Jones-Heim does not and has never asserted that these tests are not reliable for the general population. Or rather, she asserts that at the point when she presented specific exculpatory evidence demonstrating that false positives were a frequent occurrence, at that point, the prison officials had a responsibility to respond to that question with specific inculpatory evidence. And all they responded with was evidence of general reliability, which does not fulfill their constitutional burdens, Your Honor. Well, if you went to a doctor, let's pick a specialist, say a cardiologist, and you said to the doctor, have you ever heard of XYZ causing heart palpitations? And the cardiologist, who's a renowned expert, said, I'm not aware of that. Couldn't a layperson take that to mean that the doctor who's experienced and knowledgeable had never heard of that, therefore, it's not likely that that occurs? Your Honor, there are likely multiple interpretations of what NTL's statement actually meant. But once again, I would remind the Court that this is, once again, reviewing the record in the light most favorable to Ms. Jones-Heim. But don't we have to give deference to the prison adjudicator? And if you say that there was multiple ways that one can take this, why couldn't the prison adjudicator, the hearing officer, take this and the wardens who reviewed it later, take it to mean that the national laboratory who does this on an everyday basis, tests on an everyday basis, had never heard of Midrin causing a false positive. And so, therefore, there's no evidence that it does cause a false positive. Your Honor, if the defendant had spoken to NTL and if they had provided any other statement besides that they are not aware, that they don't know whether it causes false positives, it was their burden to put that into the record. Now, the question as to whether or not a reasonable person could come to the conclusion that I am not aware constitutes anything other than I don't know is a factual issue for trial. And as Judge Pragerson has noted in Zimmerman, being asked to review the record through judicial speculation is asking this Court to operate in the dark without a reason. Well, but then getting back to qualified immunity, say the warden's looking through this. And the warden reads that and says, well, that means they're the lab that does all this testing. And they had never heard of it. Therefore, you know, I think this is some evidence that she's actually used drugs. Wouldn't that be enough for qualified immunity? No, Your Honor. And I believe you're referring to Satie? Right. Yes, Your Honor. We have asserted multiple times in our briefing what this statement, not aware, constitutes. And the government has never asserted in their briefing that this not aware statement constitutes anything other than I don't know. The district court has never argued that this statement, not aware, constitutes anything other than I don't know. And therefore, we would submit that this is a factual issue that should go to trial as to whether or not any reasonable person could come to this. It's possible that we could receive partial summary judgment as to what this statement means. But don't we have to do that on a motion for summary judgment on qualified immunity? Don't we have to look at it and say, would the warden have known that by signing off on this discipline, he was violating the Constitution? He was violating her rights. In other words, she was being found guilty, losing her credits and everything based upon no evidence, lack of some evidence. Your Honor, under Saussure, we construe what the officer could have understood the law to mean, not the facts. This is a factual issue that is proper for trial. Under Saussure, we construe what the officer could have understood the law to mean. And we would submit that there was no other understanding as to what the law could be because it was clearly established by 1998 that Mies McBride, Superintendent of the Hill, and Cato B. Rushin required the DHO to respond to specific excuse me, to a factual question with specific inculpatory evidence. When did the hearing officer call this national lab? Was that after she appeared before him? Your Honor, it appears from the record, and I see that I am out of time to answer your question. You're a young guy. You've got plenty of time. Thank you, Your Honor. It appears from the record that the DHO contacted National Toxicology Laboratory before actually rendering its report. Well, was she aware of that result before he rendered his report? From the record, it does not appear that she was ever made aware of the statement by NTL. So she had no opportunity to rebut that? That is correct, Your Honor. And did this hearing officer ever call the company that manufactured this drug, talk to them? No, Your Honor. Thank you. Good morning. May it please the Court, my name is Claire Cormier. I'm an assistant United States attorney representing the appellees in this case. This is a case seeking damages against eight individuals due to actions or inactions that Ms. Jones-Heim alleges were violations of her constitutional right to due process. And the main event alleged was the issuance of prison discipline against these individuals Well, do you think she got a fair hearing? Yes, Your Honor. To the extent that the super- She brought this letter over there that showed that this was common. They even had a form letter set up for her. She testified herself that she went to this religious meeting and that the only pill that she took was what the prison gave her for the pain that she was suffering. Your Honor, the letter from Karnrick Laboratories, the one that sent that- But I know she's not a lawyer. She's not a lawyer. No one followed through. The hearing officer didn't follow through. He could have called and asked about this false positive witness, but he didn't do that. He called the national lab that does work for the government, right? He called the national lab, which was what he viewed as the recognized expert of the prison. Yeah, but, you know, there's experts and there's experts, and there are plenty of experts in this world. He didn't bother to call the manufacturer of the product. No, he didn't call, and you or I might think that that would have been a good thing to do. Judge Hamilton at the district court might have called. What did she suffer? They put her in solitary confinement for how many days? I don't recall the exact number. Yeah, over a month. Something like that, yeah. Yeah, and they took away a year of good time, the year that she was knocked off that sentence because she completed this program. Did she ever cause a problem in that prison? We don't have the records of her entire prison career, Your Honor. It just seemed to me from what I read that it was a done deal. And then the way the test was administered, they didn't even have the proper cups in there to give these three women, right? Well, Your Honor, I — They had to put it on a paper towel, and they ran around looking for that. I mean, that was pretty haphazard. Your Honor, I agree that things were not done perfectly. However, the case law is quite clear that some lapses in chain of custody or other irregularities in the process are not sufficient in the prison disciplinary context for it to be a violation of due process. To the extent that, you know, somebody thinks that in order to weigh in — What's the definition of due process in that context? In this context, there are — there's a variety of issues. The first is the procedure. Isn't fairness one of them? I don't know. Doesn't due process give her the right to have a fair hearing? Under the United States Supreme Court authority on this particular type of hearing, what she is entitled to is some evidence that supports the decision made. And some of us may think that it was an unfair decision, but the courts are not to reweigh the evidence or — But what was the sum evidence here? The sum evidence here was the lab test results under two different testing methods, testing methods that courts around the country have found to be adequate. Particularly, the EMIT test is — there are lots of cases that talk about, yes, that's But even when a case discusses the possibility that, well, you know, maybe we should really do more than that, the example that they give of what maybe more should be done are the chromatography types of tests, which was done here. And as Judge Ikuda mentioned, courts have found that type of test to be extremely accurate. So even in the absence of, for example, the Sneeth Declaration, which was not before the hearing officer but was before the district court, even in the absence of the declaration saying, you know, I run this lab and this test is, I think he said, 99 percent accurate, the courts have recognized it. And thus, given that information out there for the disciplinary hearing officer, that courts routinely accept this type of testing, that shows that there is some reliable evidence. Even if you or I might disagree, and even if you or I might think, well, you know, once you — What was the point of having this hearing, then? To allow her to present evidence. For example, using the Meeks case as a — Well, what was she supposed to do as a prisoner? Well, she had — she — I got this letter, which was kind of amazing to me, that you'd get a drug company to send a prisoner a letter that, yeah, we get a lot of these false positives. And she testified that she didn't take any drugs. She just took the medication that was given. You know, the prison could have given her — waited a while until that cleared her system, that drug, and then given her some pills and then tested her to see whether it showed false positive or not. They could have done that. They could have done that, but no authority required them to do it. Oh, no. Then that's something — a big flaw in our system, isn't it? You can take a person that's been good. You take a year off their sentence. You allow them to go to, what, a halfway house and all that. You're getting them ready to leave. And they come back, and you give them a test in a haphazard way, the way it was administered. And then on that evidence like that, you take all that away and put them in solitary confinement. Then that's something that perhaps should be addressed to Congress. But under the current state of the law and the state of the law in 1998, the proper procedures were followed. The disciplinary hearing officer weighed the evidence. As he saw fit, there was some reliable evidence to support it, and he made the decision. I wanted to address a couple of items that appellants counsel brought up. Well, there was no point in having the hearing to begin with. I disagree, Your Honor. As I was starting to say before, looking at, for example, the Meeks case out of the Seventh Circuit, in that case, the prisoner brought up evidence that the sample wasn't his. And if the sample really wasn't his, there would be no relevant evidence to support that drug test. And going through that hearing process allowed him to show evidence that the sample wasn't his. No relevant evidence of his guilt. So in some instances, there may be a utility to the hearing examination, to the hearing process. And also, had it been a different disciplinary hearing officer at a different time, that disciplinary hearing officer may have weighed the evidence differently. But they are allowed to weigh the evidence and come to the conclusion that they think is appropriate. One issue I wanted to address is the issue brought up by Judge Moskowitz about these specific defendants. As counsel indicated, plaintiff appellant alleged that the wardens personally decided her appeal. However, there is absolutely no admissible evidence of that. She stated that only in her opposition argument in her summary judgment motion. Don't they, by regulations, do that? Aren't there regulations that say that they're supposed to do that? Actually, Your Honor, if you look at 28 CFR 541.19, which isn't the specific section cited by appellants in their reply brief, but it's in the same section of the CFR, that says that when it's an appeal of a DHO decision, as opposed to other types of decisions, the appeals should be filed directly with the appropriate regional office. Which is Carlson? Which is Carlson, which is exactly what was done here. And the ---- There's nothing in the record to indicate that Schultz, Reese, or Gutierrez actually reviewed it? I looked all through, and I could not find anything except for the plaintiff's statement, not in her declaration. She did do a declaration on one of the summary judgment motions. But just in her argument on summary judgment, she states that these the wardens personally denied the appeal. But there's no admissible evidence of that. Was there any evidence as to which warden was the one who was the warden when her appeal came up? I don't recall when there was a changeover at the prison, Your Honor. However, in support of the summary ---- the original summary judgment motion brought by the defendants, in the Balish declaration at supplemental excerpts of Record 92, Mr. Balish, who reviewed the institution's files, indicated that there was no appeal at the institution level, only to the regional director and the office of general  counsel. What was that, the supplemental excerpts of the record? At what page? 92. I just wanted to address very briefly the issue that I think gets overlooked to a great extent here with the focus on the drug test and what happened at the disciplinary hearing officer level. This is a Bivens case. This is a case against individuals. Even if the Court were to find that there was a due process violation here, the Court would also have to find that the violation was clearly established by law at the time that this was taking place. And at the time that this was taking place, there was nothing that would have indicated to these defendants that anything that they did against Ms. Jones-Heim was unlawful. The clearly established law was that they had to rely on some reliable evidence. And it ----  That's correct, Your Honor. And then to the extent that we want to talk about the drug test as being some reliable evidence, there were multiple cases out there indicating that even just an EMIT test was sufficiently reliable. But the question is, now that they have this letter that says that that test can result or that drug test in general, I agree, it doesn't say which test, can result in false positives, don't they have to go a little further? Well, in this case, they did go a little further. They ---- the DHO called its own expert and said, do you know about this? And the experts at the lab said, no, we don't. And as you characterized it, I think that that can be viewed as the expert not having any knowledge of it. That can be viewed as that issue, you know, not being something that's generally accepted. But also, the Meeks case, I believe ---- I'm out of time, but I just want to ---- Well, the expert could have just said, well, I'll call this company and I'll check with them. And that might have been appropriate to do, but again, nothing required them to do that. What's Carlson's first name? Pardon me? What was Carlson's first name? Carlson, the hearing officer or the regional director? Peter, I believe. Peter. Right. I wonder if he's Norman Carlson's son. I don't know, Your Honor. Because his father was a ---- he was a great director of the Bureau of Prisons. Can I ask you this? When it went on summary judgment, did you present any evidence to show that there weren't false positives for Midran or that the false positives were very infrequent? That would be unnecessary. At the summary judgment level, we're not looking to determine whether or not the test was, in fact, accurate. That is the issue for the DHO to determine. Under Superintendent v. Hill, once it gets to the district court ---- No, I understand that, but it would seem to me as a trial judge that if one presented evidence that, for example, and this took place in 1998, that in 1998 there were very few, if any, false positives for Midran, then that would add some kind of clarity to what was meant by the statement, we're unaware of any. At the district court level, defendants submitted two different declarations of Mr. Sneath, the director of the National Toxicology Labs, and he discussed the reliability and accuracy of the tests that were done here. He didn't talk about whether they had done specific tests to check on Midran given this particular case, but he did talk about the exceptional reliability of the chromatography exams. Who represented the plaintiff at the summary judgment? She was representing herself at that time. How did she get ---- she got statements from a professor, I forget what institution, the LSU, I think, and how did she ---- she got that by herself? As far as I know, Your Honor, it's in the record. However, they weren't sworn declarations. But, yes, she obtained those by herself. If there's no further questions, I'll submit. We want to give the other student a chance here. Is that you? Go ahead. Your Honors, two points on Rabot. First, regarding the sum evidence issue, Judge Ikuda, you asked counsel, do these tests, the EMIT tests and the GCMS tests, constitute sum evidence under the legal standard? The answer is no, and that's the key distinction in this case that Judge  The fact that Ms. Jones-Heim is in the middle does not mean that that addresses the specific exculpatory evidence from the manufacturer of Midran here, that this puts Ms. Jones-Heim in the small percentage of people for which a false positive is likely. Did the letter say that the false positive was likely with both the EMIT test and the GCMS test? The letter, Your Honor, did not address either test. However, on summary judgment, viewing this evidence in the light most favorable to Ms. Jones-Heim, since she was not afforded the opportunity for a trial to sort that issue out, to have an expert from Karnrick at trial, perhaps, that is something that this Court must remand to the district court. And most importantly — Hold that thought, please. I don't want to lose it. But did they say that it was likely or that it was possible? They said both. The letter, if you look at it closely, and it's on PBER 62, says there's a possibility that it will cause a reaction for amphetamines. It qualifies that statement with the additional statement, it's such a common occurrence. So read logically, with the record that we have, it says, yes, it's a possibility, and that possibility is extremely frequent. We don't know what that common occurrence is, though. It says, this letter is in response to our telephone conversation this afternoon regarding the above. As I say on the telephone, it's such a common occurrence, we keep the standard letter in the computer. So we don't know exactly what they're relating to. That's correct, Your Honor. However, on summary judgment, we must assume, since Ms. Jones-Heim is the nonmovement, that that is an indication that it is a likelihood, a frequency that's high enough for these tests. Your Honor, the bottom line is that offer sentence. As a result of a statement that NTL was not aware, surely due process does not comport with that. Thank you, Your Honors. Thank you, and I appreciate the argument, and I want to thank the students. How about the third gentleman there? Are you the advisor? I'm sorry. Are you the advisor? Yes, I'm the advisor for the program. Oh, great. Professor, so the two of you teach at the University of Washington. Each year we have a couple of students. Yeah. Well, they did very well, and we appreciate your help on these matters. We could use a lot more in many other cases, particularly on immigration cases. We use a lot. Is that a volunteer? Yes. Thank you very much.
judges: Pregerson, Ikuta, Moskowitz